UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MARKEL AMERICAN INSURANCE COMPANY, | ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | 1:08-cv-1282-RLY-DML |
| TRAVELERS CASUALTY AND SURETY COMPANY, as successor in interest to ST. PAUL FIRE AND MARINE INSURANCE COMPANY, BEATY CONSTRUCTION, INC., WEDDLE BROS. CONSTRUCTION CO., INC., and GREENE COUNTY, INDIANA, by and through its Board of Commissioners, and GREENE COUNTY BUILDING CORPORATION, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**ENTRY ON (1) PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, (2) DEFENDANTS' (TRAVELERS and BEATY CONSTRUCTION) MOTION FOR SUMMARY JUDGMENT; and (3) TRAVELERS' MOTION FOR ORAL ARGUMENT ON MOTIONS FOR SUMMARY JUDGMENT**

Weddle Bros. Construction Co., Inc. ("Weddle") was the general contractor on a project to renovate and expand the Greene County Courthouse. Among other requirements, the addition to the courthouse required that certain Auger Cast Piles be drilled close to the existing courthouse structure. In the summer of 2002, Weddle subcontracted that work to Beaty Construction, Inc. ("Beaty"). Work on the project ceased completely when the parties discovered extensive cracking in the masonry, exterior walls, and internal plaster of the original courthouse. In March 2005, the Greene

1

County Building Commission ("GCBC") filed a ten-count complaint in the Owen Circuit Court against Weddle, among others, seeking damages associated with the courthouse renovation project. Weddle filed a Third-Party Complaint against Beaty seeking defense and indemnity under its subcontract with Beaty. That case still pends.

In the meantime, Beaty's excess insurer, Markel American Insurance Company ("Markel"), filed the present declaratory judgment action against Travelers Casualty and Surety Company[1] ("Travelers"), as successor in interest to St. Paul Fire and Marine Insurance Company ("St. Paul"), Beaty, Weddle, Greene County, Indiana, and the GCBC.[2] In its Complaint, Markel seeks a declaration from this court that: "no coverage exists under the Markel policy, if at all, until both the Beaty Policy and the Weddle Policy, which policies were issued by Travelers' predecessor, St. Paul, have been fully exhausted." (Complaint, Prayer for Relief ¶ A).

Markel, Travelers, and Beaty now move for summary judgment, and Travelers moves for oral argument. For the reasons set forth below, the court **GRANTS** Markel's motion for summary judgment, **DENIES** Travelers' and Beaty's motions for summary judgment, and **DENIES** Travelers' motion for oral argument as **MOOT**.

---

[1] Travelers asserts that it is not the proper party in interest, and that St. Paul should have been the named defendant. Because an Amended Answer has not been filed as of this date substituting St. Paul for Travelers, the court will address the named defendant, like the parties do, as Travelers.

[2] Markel names Green County, Indiana, and the GCBC solely as interested parties, and does not seek affirmative relief from them.

**I.      Facts**

    **A.      The Insurance Policies**

        **1.      The Markel Excess Policy**

1. On June 1, 2002, Markel issued a Commercial Umbrella Policy to Beaty Construction Company, policy number CU-GA-1688-02, with a limit of liability of $9,000,000 per occurrence for the policy period June 1, 2002 through June 1, 2003. ("Markel Policy"). (*See*, Plaintiff's Ex. A, Markel Policy ("Markel Policy"); *see also* Complaint ¶ 13).

2. The Markel Policy included Endorsement #13 and a Schedule of Underlying Insurance, which identified the only underlying insurance as St. Paul Policy No. KK01201011, issued to Beaty, with a limit of liability of $1,000,000 per occurrence. (Markel Policy at 1, 3, 16).

3. Weddle is not a named insured on the policy, and there is no endorsement to the policy identifying it as an additional insured.

4. The Markel Policy is, by its terms, excess to all other available insurance. (*See id.* §§ V.I., V.J).

5. The Markel Policy defines "underlying insurance" as:

> "Underlying Insurance" means the coverage(s) afforded under insurance policies designated in the Schedule of Insurance of this policy and any renewals or replacements of such policies. "Underlying Insurance" also includes any other insurance available to the insured, except such insurance as may be purchased to apply specifically in excess of this policy.

(*Id.* § VII.29).

6. The Markel Policy defines an "insured" as:

   Any other person or organization who is insured under a policy of "underlying insurance." The coverage afforded such insureds under [the Markel] policy will be no broader than the "underlying insurance" except for this policy's Limit of Insurance."

   (*Id.* § III.B.5.).

7. Markel's obligation to indemnify an insured is expressly dependent upon exhaustion of the underlying insurer's obligation to pay its limits:

   . . . [Markel's] liability for any portion of "ultimate net loss" shall not apply until the insured or any "underlying insurer" is obligated to actually pay the "retained limit."

   (*Id.* § V.R.).

8. "Retained limit" means "[t]hat amount of 'underlying insurance' applicable to a 'claim' or 'suit,'" . . . . (*Id.* § VI.).

### 2. The Beaty Policy

9. St. Paul issued a general liability insurance policy to Beaty for the period June 1, 2002 through June 1, 2003. (*See* Plaintiff's Ex. B, Beaty Policy ("Beaty Policy"); *see also* Answer of Travelers Casualty and Surety Company ("Travelers Answer") ¶ 10).

10. The Beaty Policy provides:

    This agreement is primary insurance. If there is any valid and collectible other insurance for injury or damage or employee benefits loss covered by this agreement, the following applies in connection with that other insurance.

    Other insurance means insurance, or the funding of losses, that's provided

      by or through:

           - another insurance company;

           - us, except under this agreement;

           - any of our affiliated insurance companies.

      However, we don't consider umbrella insurance, or excess insurance, that you bought specifically to apply in excess of the limits of coverage that apply under this agreement to be other insurance.

      (*Id.* at 29).

11.    The Beaty Policy further provides:

      When there is primary other insurance, we'll share with that other insurance any damages for injury or damage or employee benefits loss covered by this agreement. We'll do so with one of the methods of sharing described in the Methods of sharing section.

      However, we'll apply this agreement as excess insurance over the part or parts of any primary or excess other insurance which provide:

           - property or similar coverage for property damage to your work;

           - property or similar coverage for property damage to premises that you rent, lease, or borrow from others, other than premises you rent for a period of seven or fewer consecutive days;

           - protection for you, or any other protected person, as an additional insured or additional protected person.

      (*Id.* at 29).

12.    The Beaty Policy then describes the two methods of cost sharing in the event of "other insurance," either by equal shares or by limits. (Beaty Policy at 30).

13.    The Beaty Policy defines "covered contract" as "that part of any other contract or

agreement under which you assume the liability of another to pay damages for injury or damage." (*Id*. at 31).

14. The Beaty Policy provides coverage for Beaty's liability to pay for the liability of another to pay damage:

> . . . if you [Beaty] have assumed such liability under a covered contract made before the bodily injury or property damage occurs.

(*Id*. at 15).

15. The Beaty Policy further provides:

> . . . if you have agreed under the same covered contract to defend, or pay for the defense of, an indemnitee against a claim or suit for which such injury or damage covered by this agreement, we'll defend the indemnitee against the claim or suit.

(*Id*.).

16. The Beaty Policy also provides coverage for an Additional Protected Person, defined as:

Any person or organization which a Named Insured has by written contractual agreement executed prior to an occurrence or accident agreed to name as an additional insured.

(*Id*. at End. G0322).

### 3. Weddle's Policy

17. St. Paul also issued a commercial general liability insurance policy to Weddle, with a policy period of February 1, 2002, through February 1, 2003. (Plaintiff's Ex. C, Weddle Policy ("Weddle Policy"); *see also* Travelers Answer ¶ 11).

6

18. The Weddle Policy provides:

    **Other Insurance**

    This agreement is primary insurance.  If there is any other valid and collectible insurance for injury or damage or employee benefits loss covered by this agreement, the following applies in connection with that other insurance.

    Other valid and collectible insurance means insurance policies or contracts or alternative risk transfer or financing methods, such as risk retention groups or self insurance programs.

    (Weddle Policy at 25).

19. Like the Beaty Policy, the Weddle Policy provides a method with other primary insurance:

    **Other primary insurance.**  When there is other valid and collectible insurance that is primary, we'll share with that insurance the amounts you're legally required to pay as damages for injury and damage covered by this agreement. We'll do so with one of the methods of sharing described in the Methods of sharing section.

    (*Id.*).

    ### B. The Greene County Litigation

20. In June 2001, Greene County, Indiana, through GCBC, undertook a project to renovate and expand the Greene County Courthouse.  To that end, it entered into a variety of agreements with engineers, architects, and others to plan and execute the necessary work.  (Answer of Green County, Indiana, and Green County Building Corporation ("Green County Answer") ¶ 17).

21. GCBC opened the construction work to competitive bid in the summer or 2002,

and ultimately named Weddle general contractor for the project. (*Id.* ¶ 18).

22. The courthouse addition required that certain Auger Cast Piles be drilled very close to the existing courthouse structure. In simple terms, this work involved boring holes into the ground near the foundation of the existing courthouse and filling those bored holes with a grouting material. (*Id.* ¶ 19).

23. In 2002, Weddle entered into a subcontract with Beaty to have Beaty install the Augur Cast Pilings. (*Id.* ¶ 20); Answer of Weddle Bros. Construction Company ("Weddle Answer") ¶ 20).

24. The subcontract between Beaty and Weddle obligated Beaty to obtain general liability insurance naming Weddle as an insured. (Answer of Beaty Construction, Inc. ("Beaty Answer") ¶ 22).

25. Between December 2002 and January 2003, Beaty installed a test pile and production August Case Pilings. (*Id.* ¶ 23).

26. In January 2003, work on the courthouse project stopped, when the settlement of the existing courthouse structure was discovered. (Greene County Answer ¶ 24).

27. In March 2005, GCBC filed a ten-count Complaint in the Circuit Court of Owen County, Indiana, against Weddle and others seeking damages associated with the courthouse renovation project (the "Greene County Litigation"). Weddle filed a Third-Party Complaint against Beaty, alleging that it was liable for damage to the original courthouse, and seeking indemnification under its subcontract. (Weddle Answer ¶ 26; Beaty Answer ¶ 26; Greene County Answer ¶ 26).

28. Travelers appointed defense counsel to represent Beaty in the Greene County Litigation, and appointed separate counsel to represent Weddle. (Beaty Answer ¶ 27; Travelers Answer ¶¶ 27-28; Weddle Answer ¶ 28).

29. The Greene County Litigation still pends.

## II.  Standard of Review

Summary judgment is appropriate where the pleadings, affidavits, and other materials on file demonstrate that there exists "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). Jurisdiction of this case is based upon diversity of citizenship, and, as all material events occurred in Indiana, the parties agree that Indiana substantive law applies. "Indiana courts have recognized that 'construction of an insurance policy is a question of law for which summary judgment is particularly appropriate.'" *Myles v. General Agents Ins. Co. of Am., Inc.*, 197 F.3d 866, 868 (7th Cir. 1999) (quoting *Piers v. American United Life Ins. Co.*, 714 N.E.2d 1289, 1290 (Ind.Ct.App. 1999)).

The interpretation of an insurance policy is subject to the same rules of construction and interpretation as any other contract. *Amerisure, Inc. v. Wurster Constr. Co., Inc.*, 818 N.E.2d 998, 1001 (Ind.Ct.App. 2004); *Myles*, 197 F.3d 866 at 868 (applying Indiana law). Thus, the goal in interpreting an insurance policy is to ascertain and enforce the parties' intentions as expressed in the written contract, reading the "four corners" of the document as a whole. *Am. Family Ins. Co. v. Globe Am. Cas. Co.*, 774 N.E.2d 932, 935 (Ind.Ct.App. 2002). If the terms of an insurance policy are clear and

unambiguous, its language must be given its plain and ordinary meaning.  *Castillo v. Prudential Prop. and Cas. Ins. Co.*, 834 N.E.2d 204, 206 (Ind.Ct.App. 2005).  If, however, reasonable persons would differ as to the meaning of the policy language, the policy language is ambiguous and must be viewed from the standpoint of an ordinary insured.  *Id.*; *Burkett v. Am. Family Ins. Group*, 737 N.E.2d 447, 452 (Ind.Ct.App. 2000).  An ambiguity in an insurance policy is construed both to favor the insured and to further indemnify.  *Nat'l Fire and Cas. Co. v. West*, 107 F.3d 531, 535 (7th Cir. 1997) (citing *Eli Lilly & Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470 (Ind. 1985)).

### III.    Discussion

Travelers has taken the position that once its primary policy issued to Beaty has been exhausted, Markel's umbrella policy should apply to any difference between the settlement or judgment in the Greene County Litigation and the limits of the primary policy issued to Beaty.  In other words, the Weddle Policy would remain untouched.  The practical effect of this position is to reduce Travelers' own exposure from $2,000,000 – the combined, per-occurrence limits of both the Weddle Policy and the Beaty Policy – to $1,000,000, the per-occurrence limits of only the Beaty Policy.  Not surprisingly, Markel is of the opinion that it has no obligation to indemnify its insured under the umbrella policy it issued to Beaty unless and until both the Beaty and Weddle Policies have first exhausted their limits of liability.

#### A.    The Markel Umbrella Policy Is A True Excess Policy

Under Indiana law, a "true excess" policy is one that is excess over any type of

primary coverage.  *See Monroe Guaranty Ins. Co. v. Langreck*, 816 N.E.2d 485, 493 (Ind. Ct. App. 2004) (internal citations omitted) ("[T]he prevailing rule is that umbrella insurance coverage is 'true excess over and above any type of primary coverage, excess provisions arising in regular policies in any manner, or escape clauses.'").

The Markel Policy is, by its express terms, a "true excess" policy and is not triggered unless and until the insured has first exhausted all available primary coverage. *Monroe Guaranty*, 816 N.E.2d at 493.  For example, the Markel Policy provides:

> 1. If other insurance is available to the insured for "ultimate net loss" we cover under this policy, our obligations under this policy are limited as follows:
>
>    a. This insurance is excess over any other insurance, whether such insurance is stated to be primary, excess, contributing, contingent, or on any other basis.  This provision does not apply to such insurance specifically purchased to apply in excess of this policy's Limit of Insurance.
>
> 2. Since this policy is excess over any other insurance as noted in J.1.a above, we will pay only our share of the amount of "ultimate net loss," if any, that exceeds the sum of:
>
>    a. The total amount that all such other insurance would pay for the loss in the absence of this insurance; and
>
>    b. the total of all deductible and self-insured amounts under this policy or any other insurance . . . .

(Markel Policy at § V.J.).  The Markel Policy's definition of "underlying insurance" provides additional support for this finding:

> "Underlying Insurance" means the coverage(s) afforded under insurance policies designated in the Schedule of Insurance of this policy and any renewals or replacements of such policies.  "Underlying Insurance" also

> includes *any other insurance available to the insured*, except such
> insurance as may be purchased to apply specifically in excess of this policy.

(Markel Policy. § VII.29) (emphasis added).

In addition, Markel's obligation to indemnify is expressly dependent upon exhaustion of all primary insurers' obligation to pay their limits:

> . . . [Markel's] liability for any portion of "ultimate net loss" shall not apply until the insured or any "underlying insurer" is obligated to actually pay the "retained limit."

(Markel Policy at § V.R.). Finally, the Markel Policy defines an "insured" as:

> Any other person or organization who is insured under a policy of "underlying insurance." The coverage afforded such insureds under [the Markel] policy will be no broader than the "underlying insurance" except for this policy's Limit of Insurance."

(*Id.* § III.B.5.). Thus, the Markel Policy is a "true excess" policy under Indiana law, and as such, it is "always excess" to any available primary insurance. *See Monroe Guaranty Ins. Co. v. Langreck*, 816 N.E.2d 485, 493 (Ind. Ct. App. 2004).

### B. Weddle Is An Insured Under the Markel and Beaty Policies

Having established that the Markel Policy is a "true excess" policy, the court must next determine whether Weddle is an insured under that policy. It is undisputed that Weddle's Policy is not listed on the Schedule of "Underlying Insurance" referenced in the Markel Policy.

Markel issued a commercial umbrella policy to Beaty, under which it agreed to provide coverage for losses that exceeded the limits contained in Beaty's primary policy

and that also exceeded the limits of any other insurance available to the insured:

> "Underlying Insurance" means the coverage(s) afforded under insurance policies designated in the Schedule of Insurance of this policy and any renewals or replacements of such policies. "Underlying Insurance" also includes *any other insurance available to the insured*, except such insurance as may be purchased to apply specifically in excess of this policy.

(Markel Policy § VII.29) (emphasis added). The Beaty Policy, in turn, provides that it will extend coverage to:

> Any person or organization which a Named Insured has by written contractual agreement executed prior to an occurrence or accident agreed to name as an additional insured.

(Beaty Policy at End. G0322). The Markel Policy defines an "insured" to mean:

> Any other person or organization who is insured under a policy of "underlying insurance." The coverage afforded such insureds under [the Markel] policy will be no broader than the "underlying insurance" except for this policy's Limit of Insurance."

(*Id.* § III.B.5.). Based upon these definitions, both Beaty and Weddle are "insureds" under both the Beaty Policy and the Markel Umbrella Policy.

### C. Exhaustion of the Underlying Policies

The final issue the court must decide is whether both the Beaty and Weddle policies, which were both incidentally issued by Travelers, must exhaust before coverage under the Markel Policy is triggered.

The Beaty Policy provides:

> This agreement is primary insurance. If there is any valid and collectible other insurance for injury or damage or employee benefits loss covered by this agreement, the following applies in connection with that other insurance.

13

> Other insurance means insurance, or the funding of losses, that's provided by or through:
>
> - another insurance company;
>
> - us, except under this agreement;
>
> - any of our affiliated insurance companies.
>
> However, we don't consider umbrella insurance, or excess insurance, that you bought specifically to apply in excess of the limits of coverage that apply under this agreement to be other insurance.

(Beaty Policy at 29). The Beaty Policy also describes the method to employ when sharing a loss with other available insurers:

> When there is primary other insurance, we'll share with that other insurance any damages for injury or damage or employee benefits loss covered by this agreement. We'll do so with one of the methods of sharing described in the Methods of sharing section.
>
> However, we'll apply this agreement as excess insurance over the part or parts of any primary or excess other insurance which provide:
>
> - property or similar coverage for property damage to your work;
>
> - property or similar coverage for property damage to premises that you rent, lease, or borrow from others, other than premises you rent for a period of seven or fewer consecutive days;
>
> - protection for you, or any other protected person, as an additional insured or additional protected person.

(*Id*. at 29). Giving these provisions their plain and ordinary meaning, Travelers obligated itself to provide primary coverage, and to share the costs of any loss with other primary insurance carriers whose policies might respond to the loss. Likewise, Travelers expressly agreed that it would not consider Markel, as an umbrella policy purchased to

apply in excess of the Beaty Policy, as "other insurance."

Similarly, the Weddle Policy provides:

**Other Insurance**

This agreement is primary insurance. If there is any other valid and collectible insurance for injury or damage or employee benefits loss covered by this agreement, the following applies in connection with that other insurance.

Other valid and collectible insurance means insurance policies or contracts or alternative risk transfer or financing methods, such as risk retention groups or self insurance programs.

(Weddle Policy at 25). Like the Beaty Policy, the Weddle Policy provides for cost sharing with other primary insurance:

**Other primary insurance.** When there is other valid and collectible insurance that his primary, we'll share with that insurance the amounts you're legally required to pay as damages for injury and damage covered by this agreement. We'll do so with one of the methods of sharing described in the Methods of sharing section.

(*Id.*).

By their own terms, both the Beaty Policy and the Weddle Policy obligate themselves as primary insurance, and contemplate the Markel Policy as true excess coverage. However, the issue of whether both the Beaty and Weddle Policies must exhaust before the Markel Policy comes into play is dependent upon a judgment or settlement in the Green County Litigation. To the extent that there is a judgment or settlement against Weddle, both the Beaty and Weddle Policies must exhaust before Markel has any obligation to provide excess coverage under the Markel Policy. To the

15

extent there is a judgment or settlement solely against Beaty, only the Beaty Policy must exhaust before Markel is obligated to provide excess coverage under the Markel Policy. Markel's Motion for Summary Judgment is therefore **GRANTED** in part, and Traveler's and Beaty's Motions for Summary Judgment are **DENIED** in part. Having so ruled, Travelers' Motion for Oral Argument is **DENIED** as **MOOT**.

### IV.     Conclusion

For the reasons set forth above, the court declares and determines that, to the extent there is a settlement or judgment against Weddle in the Greene County Litigation, both the Weddle and Beaty Policies must exhaust before Markel is obligated to provide coverage under the Markel Policy. The court further declares and determines that, to the extent there is a judgment solely against Beaty, the Beaty Policy must exhaust before the Markel Policy comes into play. Accordingly, Markel's Motion for Summary Judgment (Docket # 62) is **GRANTED** in part, Travelers' Motion for Summary Judgment (Docket # 59) is **DENIED** in part, and Beaty's Motion for Summary Judgment (Docket # 61) is **DENIED** in part. Travelers' Motion for Oral Argument on Motions for Summary Judgment (Docket # 82) is **DENIED** as **MOOT**.


**SO ORDERED** this  7th   day of July 2010.

_____
RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

Adrian Sammey Allen
BOSE MCKINNEY & EVANS, LLP
aallen@boselaw.com

Scott B. Cockrum
HINSHAW & CULBERTSON
scockrum@hinshawlaw.com

Amanda C. Couture
DELANEY & DELANEY
acouture@delaneylaw.net

Kathleen Ann DeLaney
DELANEY & DELANEY LLC
kathleen@delaneylaw.net

Sean Thomas Devenney
DREWRY SIMMONS VORNEHM, LLP
sdevenney@drewrysimmons.com

Daniel Michael Drewry
DREWRY SIMMONS VORNEHM, LLP
ddrewry@drewrysimmons.com

Michael Francis Drewry
DREWRY SIMMONS VORNEHM, LLP
mdrewry@drewrysimmons.com

Thomas M. Hamilton Jr.
HINSHAW & CULBERTSON, LLP
thamilton@hinshawlaw.com

Vilda Samuel Laurin III
BOSE MCKINNEY & EVANS, LLP
slaurin@boselaw.com

Edmund S. McAlister
MECKLER BULGER TILSON MARICK & PEARSON LLP
ed.mcalister@mbtlaw.com

Steven D. Pearson
MECKLER BULGER TILSON MARICK & PEARSON LLP
steve.pearson@mbtlaw.com

Stephen J. Peters
HARRISON & MOBERLY
speters@h-mlaw.com